******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* SIGFREDO ROSARIO
## (AC 42827)

Bright, C. J., and Elgo and DiPentima, Js.

*Syllabus*

Convicted, following a jury trial, of the crime of larceny in the second degree, the defendant appealed to this court. The defendant, a resident of a condominium complex in Waterbury, became the president of the board of directors of the condominium association. P, the treasurer of the board of directors, became concerned about the association's finances and asked the defendant for financial information, which he failed to provide. P examined the bank records of the association and noticed that checks had been written from the association's bank account to the defendant and deposited in the defendant's personal bank account. The defendant explained that he made withdrawals from his personal bank account for legitimate purchases for the condominium complex, but admitted that he also used the funds for personal items. The defendant's sentence included probation with special conditions, including the payment of restitution. On the defendant's appeal to this court, *held*:

1. The defendant could not prevail on his claim that the trial court committed plain error when it required him, as a special condition of probation, to pay restitution, which was based on his claim that the court did not first consider the factors enumerated in the applicable statute (§ 53a-28 (c)): the court did consider the factors in § 53a-28 (c) (3), as it stated in its second articulation that the defendant had an earning capacity that would enable him to make restitution, and the court noted that, at sentencing, the defendant stated that he was able to work and that he was financially supported by his mother, and the court also considered the rehabilitative effect on the defendant of paying restitution and the impact on the victims.

2. The trial court did not abuse its discretion in denying the defendant's motion for an extension of time within which to begin making restitution payments: the court granted the defendant an extension of time to begin making restitution payments to six months after the original start date, and, although the defendant claimed that he was not provided with sufficient time to generate income, the court found that the defendant had a responsibility to find alternative ways to earn funds to make the restitution payments.

3. The defendant could not prevail on his unpreserved constitutional claim that the trial court violated his due process right to a fair and impartial trial when it questioned him and two of the state's witnesses, H and P: the court's questioning of H, a detective, was not inappropriate because the court stated that its questions were intended to clarify H's testimony, and the record appeared consistent with this purpose; moreover, the court properly intervened to clarify the self-represented defendant's testimony, particularly in light of his inclusion of irrelevant material in his testimony and his disruptive conduct, the fact that the court's questions may have drawn attention to the strength of the state's case did not render those questions improper, the court's questions did not suggest anything about the credibility of any witnesses or advocate in favor of a particular verdict, and the court's questions did not prejudice the defendant because the elicited facts were not truly in dispute; furthermore, the court did not act as an advocate for the state when it questioned P regarding the defendant's identity, as the court's questions, viewed in the context of the entire trial, did not prejudice the defendant or improperly influence the outcome of the proceedings.

Argued October 12, 2021—officially released January 4, 2022

*Procedural History*

Substitute information charging the defendant with the crime of larceny in the second degree, brought to the Superior Court in the judicial district of Waterbury, geographical area number four, and tried to the jury

before *Crawford, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Joseph S. Danielowski*, assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, Sigfredo Rosario, appeals from the judgment of conviction, rendered following a jury trial, of larceny in the second degree in violation of General Statutes §§ 53a-119 (1) and 53a-123 (a) (2). On appeal, the defendant claims that the court (1) improperly ordered that he pay restitution without first considering the factors enumerated in General Statutes § 53a-28 (c), (2) abused its discretion in denying his motion for an extension of time within which to begin making restitution payments and (3) violated his due process right to a fair and impartial trial when it questioned him and two of the state's witnesses.[1] We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant. The defendant resided at the Lincoln Park condominium complex in Waterbury and became the president of the board of directors of the Lincoln Park condominium association (association) in May, 2013. In November, 2014, Omayra Pizarro, the treasurer of the board of directors of the association, became concerned about the finances of the association and asked the defendant for financial information related to her concerns. When the defendant failed to provide such information, Pizarro examined the bank records of the association and noticed that checks had been written from the association's bank account to the defendant. Pizarro shared her concerns with James Loughlin, the general counsel for the association, and Loughlin asked the defendant for an accounting, which the defendant declined to provide.

Pizarro then contacted Detective Kyle Howles of the Waterbury Police Department and provided him with the association's bank records and bylaws, which state that no member of the board of directors shall receive compensation from the association for acting as such. Howles then contacted the defendant, who provided Howles with his personal bank records. Howles' investigation revealed that thirteen checks, totaling $47,931.60, had been written from the association's bank account to the defendant and had been deposited in the defendant's personal bank account. The defendant made withdrawals from that same personal bank account for legitimate purchases for the condominium complex, as well as for personal items such as gasoline, groceries, fast food, mortgage payments and cell phone bills. The defendant explained to Howles that he had placed the money into his personal bank account because he needed cash to pay for projects around the condominium, to pay day laborers who only accepted cash and to negotiate better prices with contractors; he did concede, however, that there was no accounting, notes, or record of those expenses. Howles did not include in his calculation of personal expenses any withdrawals that possibly were

related to condominium improvements. Howles determined that the defendant had withdrawn "just short of $20,000" from the subject bank account for expenses that the defendant had acknowledged were personal. The defendant testified at trial that he "took thirteen checks for $47,131.60" from the association and that he used $17,515.09 of that amount for personal expenses.

Following a jury trial, the defendant was convicted of larceny in the second degree. The court, *Crawford, J.*, sentenced the defendant to five years of imprisonment, execution suspended, and five years of probation with special conditions, including the payment of restitution in the amount of $17,500, to be paid at a rate of $400 per month beginning in February, 2019. This appeal followed.

The defendant filed a motion for stay of execution of his probation, a motion for stay of the conditions of his probation and a motion for extension of time to start making the restitution payments, which motions the trial court denied. The defendant filed a motion for articulation on December 11, 2019, requesting that the court articulate the basis, according to the factors in § 53a-28 (c), for its order of restitution. On January 8, 2020, the court issued an articulation in which it referenced an excerpt of the transcript of a June 17, 2019 hearing on the defendant's postverdict motions for stay of execution of his probation, for stay of the conditions of his probation and for an extension of time to start making the restitution payments. The defendant filed a second motion for articulation on January 23, 2020, requesting a further articulation as to the court's decision to impose restitution pursuant to § 53a-28 (c). The court issued a second articulation on March 4, 2020, explaining the factual and legal basis for its decision to impose restitution. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court committed plain error when it required him, as a special condition of probation, to pay restitution in the amount of $400 per month without first considering the factors enumerated in § 53a-28 (c).[2] He argues that the court had before it no evidence that he had any income, assets or the ability to generate enough income to pay $400 per month in restitution. We are not persuaded.

"Plain error review may be appropriate when a court fails to follow or apply a statute that is clearly relevant to the case. . . . Nevertheless, [r]eview under the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [T]he core of the plain error doctrine . . . concerns whether a defendant can prevail on the merits of a claim, not

simply whether the claim can be reviewed. . . . Consequently, [w]here a trial court's action does not result in any manifest injustice, a defendant's claim under the plain error doctrine does not warrant review." (Citations omitted; internal quotation marks omitted.) *State v. Moore*, 85 Conn. App. 7, 11, 855 A.2d 1006, cert. denied, 271 Conn. 937, 861 A.2d 510 (2004).

Section 53a-28 (c) (3) provides in relevant part that, "[i]n determining the appropriate terms of financial restitution, the court shall consider: (A) The financial resources of the offender and the burden restitution will place on other obligations of the offender; (B) the offender's ability to pay based on installments or other conditions; (C) the rehabilitative effect on the offender of the payment of restitution and the method of payment; and (D) other circumstances, including the financial burden and impact on the victim, that the court determines make the terms of restitution appropriate. . . . The court shall articulate its findings on the record with respect to each of the factors set forth in subparagraphs (A) to (D), inclusive, of this subsection. . . ."

We conclude that the court's remarks at sentencing, combined with its second articulation, make clear that the court considered the relevant factors in § 53a-28 (c) (3) (A) through (D).[3] In light of our determination that the alleged error did not occur, we need not address the defendant's argument that § 53a-28 (c) (3) mandates that the court articulate its findings on the record with respect to the four factors in subparagraphs (A) through (D).

With respect to the factors enumerated in subparagraphs (A) and (B) of § 53a-28 (c) (3), which concern the defendant's ability to pay restitution and the defendant's financial resources and the burden restitution would place on him, the court, in its second articulation, stated that "[t]he defendant has an earning capacity that would enable him to make . . . restitution." The court further elaborated that the defendant graduated from high school, received a certificate from a Turbo Jet Flight Engineer course, earned credits from two other programs, has experience in real estate, "can be of help in the community in reviving vacant office buildings," has computer skills, can work as a consultant related to computers and has worked as a consultant from 2008 through 2015. The court also noted in that second articulation that, at sentencing, in requesting probation, the defendant stated that he has the ability to work and further noted that the defendant is supported financially by his mother.

The court also considered the rehabilitative effect on the offender of paying restitution and the impact on the victims pursuant to subparagraphs (C) and (D) of § 53a-28 (c) (3). At the sentencing hearing, the court stated to the defendant: "[Y]ou knew you had no access to the funds, and I didn't know at what point you decided that you were entitled to it, but . . . these are

hardworking people and I think it's more important that there be restitution." In its second articulation, the court explained that "[t]he victims here are the individual condo unit owners who paid their condo fees to the association so that those funds would be available to pay the expenses connected with common ownership. The defendant said he was really sorry and remorseful. Therefore, the defendant making restitution would make the victims whole, be an acceptance of responsibility for his criminal conduct, and a step towards rehabilitation." For the foregoing reasons and in light of the fact that the court articulated its findings on the record regarding the four factors in § 53a-28 (c) (3) (A) through (D), we conclude that reversal under the plain error doctrine is not warranted.

II

The defendant next claims that the court abused its discretion by denying his motion for an extension of time within which to begin making restitution payments. We are not persuaded.

We employ an abuse of discretion standard to this claim. "When reviewing claims under an abuse of discretion standard . . . great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Francis*, 338 Conn. 671, 679, 258 A.3d 1257, cert. denied, *Francis* v. *Connecticut*, U.S. , 142 S. Ct. 292, 211 L. Ed. 2d 136 (2021); see also See *State* v. *Doriss*, 84 Conn. App. 542, 548–49, 854 A.2d 48 (court has broad discretion in imposing sentence), cert. denied, 271 Conn. 922, 859 A.2d 581 (2004).

As previously stated, the court, at the December 14, 2018 sentencing hearing, ordered the defendant to make restitution payments of $400 per month beginning in February, 2019. On May 1, 2019, the defendant filed a motion for extension of time to begin making restitution payments. At a May 15, 2019 hearing on that motion, the defendant stated that he had not made any payments because the start date of February, 2019, did not provide him with sufficient time and that he has been trying to find ways to generate income in order to make the restitution payments. The court noted that the defendant failed to comply with the terms of probation and that it had stated at the sentencing hearing that if the defendant missed two consecutive payments, then the matter could be referred for a violation of probation. The court stated that further argument on the motion would be heard at the next court date in order to provide the then self-represented defendant with time to provide appropriate documentation.

At a June 17, 2019 hearing,[4] the court denied the

motion for an extension of time but ordered the defendant to start making restitution payments beginning on August 1, 2019. The court noted that, other than pursuing job prospects that were "highly unlikely" to materialize, the defendant did not immediately look for ways to generate income after having been sentenced in December, 2018, and that the defendant had a responsibility to find alternative ways to earn the funds to make the restitution payments. In light of the foregoing, including the extension of time to August 1, 2019, to begin making restitution payments, which date was six months after the original start date of February, 2019, we conclude that the court's denial of the motion for extension of time, was not an abuse of its wide discretion.

### III

The defendant claims that the court violated his due process right to a fair and impartial trial when it questioned him and two of the state's witnesses, Howles and Pizzaro, at trial. The defendant acknowledges that his claim is unpreserved and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40. The record is adequate for review and the claim, which alleges a violation of a fundamental right, is of constitutional magnitude. See, e.g., *State* v. *Swilling*, 180 Conn. App. 624, 633, 639, 184 A.3d 773 (claim that court violated defendant's right to due process by questioning witnesses was of constitutional magnitude), cert. denied, 328 Conn. 937, 184 A.3d 268 (2018).

We begin with the following principles. "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . Consistent with [her] neutral role, the trial judge is free to question witnesses or otherwise intervene in a case in an effort to clarify testimony and assist the jury in understanding the evidence so long as [the trial judge] does not appear

partisan in doing so. . . . One of the chief roles of the trial judge is to see that there is no misunderstanding of a [witness'] testimony. . . . A trial judge can do this in a fair and unbiased way . . . [and an] attempt to do so should not be a basis of error. . . . Whether or not the trial judge shall question a witness is within [her] sound discretion . . . [and] [i]ts exercise will not be reviewed unless [s]he has acted unreasonably, or, as it is more often expressed, abused [her] discretion. . . . The trial judge can question witnesses both on direct and cross-examination. . . . [I]t may be necessary to do so to clarify testimony as [the judge] has a duty to comprehend what a witness says . . . [and] to see that the witness communicates with the jury in an intelligible manner. . . . While no precise theorem can be laid down, we have held that it is proper for a trial court to question a witness in endeavoring, without harm to the parties, to bring the facts out more clearly and to ascertain the truth . . . and [intervene] where the witness is embarrassed, has a language problem or may not understand a question. . . . Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 651–52, 881 A.2d 1005 (2005). "Any claim that the trial judge crossed the line between impartiality and advocacy is subject to harmless error analysis." *State* v. *Burke*, 51 Conn. App. 328, 335, 723 A.2d 327 (1998), cert. denied, 248 Conn. 901, 732 A.2d 177 (1999).

Mindful of these principles, we first examine the court's questioning of Detective Howles and the defendant. Howles testified to the following on direct examination. He became involved in the matter as a result of Pizarro's November, 2014 complaint concerning the finances of the association. Following that complaint and upon examining the defendant's personal bank records, he discovered that the defendant had deposited into his personal account thirteen checks, totaling $47,931.60, which had been written from the association to the defendant and that the defendant had made withdrawals from that same account for expenses related to the condominium complex as well as for expenses that the defendant had admitted to Howles were personal, such as for gasoline, groceries, fast food, mortgage payments and cell phone bills. Howles also testified that the defendant's personal bank records showed that the only deposits into the defendant's bank account were from the association, with the exception of approximately $1200 to $1300. He further explained that he only included in his calculation of the defendant's personal expenses those that could not possibly be related to the improvement of the condominium com-

plex. The defendant had no questions for Howles. Thereafter, the court stated that Howles needed to "clarify a couple of things" and proceeded to elicit the following testimony from Howles: a phone call from the treasurer of the association prompted Howles' involvement; Howles did not recall when the defendant became the president of the association; Howles had examined the bank accounts of both the association and the defendant from January until November or December, 2014, during which time frame the defendant was the president of the association; the defendant had written checks from the association to his personal bank account in his role as the president of the association; approximately $1200 to $1300 was deposited into the defendant's personal banking account from sources other than the association; the defendant had written checks from the association to himself, and Howles included in his calculation of personal expenses only the withdrawals that could not be possibly related to expenses for the condominium complex.

We cannot conclude, on the basis of the record, that the court's questioning of Howles was inappropriate. The court stated that its questions were intended to clarify certain points in Howles' testimony, and the record appears consistent with this stated purpose. "Unlike an appellate court, the trial court is able to observe the testimony of witnesses firsthand and, therefore, is better able to assess the relative clarity—or lack thereof—of any particular testimony." *State* v. *Gonzalez*, 272 Conn. 515, 536, 864 A.2d 847 (2005). "[T]he trial judge is free to question witnesses or otherwise intervene in a case in an effort to clarify testimony and assist the jury in understanding the evidence so long as [s]he does not appear partisan in doing so." (Internal quotation marks omitted.) *State* v. *Brown*, 56 Conn. App. 26, 29, 741 A.2d 321 (1999), cert. denied, 252 Conn. 927, 746 A.2d 790 (2000).

The defendant, who was the sole defense witness, testified that he became the president of the association in order to improve the association, that he used his personal bank account to fund projects for the association and for personal expenses, that he personally did work to improve the grounds of the condominium complex, that the association owed him $4558.09 for damage to his condominium unit that the association had been reimbursed through an insurance claim, that he wrote thirteen checks totaling $47,131.60 from the association to himself in 2014, and that he used $17,515.09 of that amount for personal expenses. Following the defendant's redirect testimony, the court, through its questions, elicited the following responses from the defendant: his bank account was "mixed, business and personal"; he began writing checks to himself from the association's account in February, 2014; the association's bank account was electronic and did not require a signature, but he signed the checks in order to cash

them; the entire $47,931.60 that he deposited from the association's account to his personal bank account was spent to benefit the association and that he reimbursed himself $17,515.09 that he believed was owed to him, including $5000 in relation to a lawsuit against the association that he had filed and withdrew concerning an insurance payment to the association.

Relevant to our analysis, we also note that, during the self-represented defendant's narrative testimony on the third day of trial and outside the presence of the jury, the court warned the defendant that he had been told "time and time again" that he could not make comments or give his opinion of the evidence, that he was including "a lot of irrelevant material" in his testimony and that the court did not see any good faith on his part. The court noted that the defendant had become disruptive in terms of how he chose to conduct himself.[5]

Under these circumstances, we cannot conclude that the court abused its discretion in intervening to clarify the defendant's testimony, particularly in light of his inclusion of irrelevant material in his testimony and his disruptive conduct. "It is appropriate for the trial judge from time to time to intervene in the conduct of a case. Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts." (Internal quotation marks omitted.) *State* v. *Fernandez*, 198 Conn. 1, 11, 501 A.2d 1195 (1985). The court's questioning of the defendant, whose testimony lacked clarity, reflected a reasonable and impartial attempt to clarify his testimony to assure that the witness communicated to the jury in an intelligible manner. Such an attempt should not be a basis of error. See *State* v. *Gonzalez*, supra, 272 Conn. 535–36. "Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding." (Internal quotation marks omitted.) Id., 536.

The defendant argues that the court's questions to him and to Howles related to testimony that was detrimental and central to his case. However, the fact that the court's questions may have drawn attention to the strength of the state's case does not render those questions improper. See *State* v. *Smith*, 200 Conn. 544, 550, 512 A.2d 884 (1986) (court's questioning of witness is not necessarily improper merely because it draws attention to strengths or weaknesses of party's case). The court's questions did not suggest anything about the credibility of any witnesses, did not advocate in favor of a particular verdict, or otherwise suggest that it believed or disbelieved any particular version of the

events. See *State* v. *Swilling*, supra, 180 Conn. App. 644–45. Rather, the court impartially asked Howles and the defendant to restate certain portions of their testimony. Therefore, the questions served merely to clarify their testimony for the jury. See *State* v. *Gonzalez*, supra, 272 Conn. 537 ("[a court's] comments or questions for the purpose of clarifying . . . testimony are permissible and often necessary" (internal quotation marks omitted)), quoting *State* v. *Mack*, 197 Conn. 629, 641, 500 A.2d 1303 (1985).

Moreover, the court's questions did not prejudice the defendant because the relevant elicited facts were not truly in dispute. The defendant testified before being questioned by the court: "I took the $47,000 from the condominium complex. I deducted the $17,515.09 that I used for personal things, such as my mortgage, cable, and blah, blah, blah, blah, blah, blah. At the end of that, that leaves a balance of $30,416.51, which were used for Lincoln Park condominium basics. Therefore, it clearly illustrates that that account was being used for dual purposes. Even though, now, it's a major mistake, I realize that now." Furthermore, during its charge, the court, *Doyle, J.*,[6] issued the following curative instruction to the jury: "You should not be influenced by the court's actions during the trial in ruling on motions or objections by counsel, or in comments to counsel, or in questions to witnesses, or in setting forth the law in these instructions. You are not to take any actions by the court, either Judge Crawford or myself, as . . . any indication of our opinion as to how you should determine the issues of fact." "Our appellate courts have always given great weight to curative instructions in assessing claimed errors . . . especially in assessing a defendant's claim of prejudice." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 56 Conn. App. 29–30.

Finally, the defendant argues that, in the court's questioning of Pizarro regarding the defendant's identity, it acted as an advocate for the state when it asked her to identify the defendant in the courtroom. During the prosecutor's redirect examination of Pizarro, the court engaged in the following colloquy with Pizarro:

"The Court: Okay. I just have a couple of questions . . . what I'm not clear on is: first of all, the person you refer to as the president, Mr. Rosario, the defendant, would you identify him for the record, please—that's not what I wanted to do. . .

"[Pizarro]: Yeah, the person I was identifying as the president is Mr. Rosario.

"The Court: Just a second—no, is that person in the courtroom?

"[Pizarro]: Yes, he is.

"The Court: All right. Would you identify him, please.

"[Pizarro]: Mr. Rosario, the defendant.

"The Court: I need—and you need to just describe something that he's wearing for the record.

"[Pizarro]: He's wearing a black suit with a burgundy tie.

"The Court: Okay. All right.

"[Pizarro]: It looks black.

"The Court: Thank you. Okay."

This exchange is somewhat troubling. Although Pizarro had testified on direct examination about her concerns regarding "Mr. Rosario's" actions involving the association's finances, she did not, either in response to questioning by the prosecutor or the defendant, make an in-court identification of the defendant as the person she knew to be "Mr. Rosario." Thus, this was not a situation in which the court was clarifying a witness' prior ambiguous in-court identification of the defendant. See, e.g., *State* v. *Swilling*, supra, 180 Conn. App. 641–42 (no due process violation when court questioned victim as to whether "the person she had identified as the perpetrator of the crimes, and who was present in the courtroom, was the person she had previously identified as 'Mr. Swilling' " because court was clarifying victim's prior ambiguous in-court identification of defendant). The court's questions in the present case, however, when viewed in context of the entire trial, did not prejudice the defendant.[7]

A review of the record reveals that, during the defendant's questioning of the state's witnesses, he identified himself as the person whose conduct was at issue. During the defendant's cross-examination of Pizarro, which preceded the court's questioning of her, he asked: "On November 18, you called the police department to say that I misappropriated $52,931.60." During his cross-examination of Loughlin, who also testified prior to Pizarro, the defendant inquired as to how Loughlin became the counsel for the association, and Loughlin explained, "[i]t was before I met you and it was [Pizarro], I think, called me and asked if I was interested. It was a call out of the—was it you who called?" The defendant responded, "[i]t was me." When the defendant further inquired as to whether Loughlin had any financial records of the association, Loughlin explained, "I do have that, that you generated as a summary of—" at which point the defendant interjected, "[t]hat I generated. But [what] I'm asking is something [independent] of me. . . ." During the defendant's recross-examination of Pizarro, the defendant identified himself as the individual who allegedly wrote checks in his own name from the association's bank account. He asked: "When was the first check that I wrote to myself?" Pizarro explained that it was sometime in 2014, and that she had provided the relevant information to the Waterbury

Police Department. Tremaine Williams, a resident of the condominium complex, testified on direct examination that, in 2014, he had performed work in relation to the condominium complex and that his relationship with "Mr. Rosario" was positive until he received letters from Pizarro that the accounts of the association were not balanced. On cross-examination and in response to a question from the defendant regarding the status of their friendship prior to 2015, Williams responded: "[W]e were friends. I'm the one [who] voted you . . . wanted [you] to be president." The defendant then asked whether Williams worked for him in 2014, and Williams responded in the affirmative. In light of questions and responses such as these, we do not see how the judge's questioning of Pizarro regarding the defendant's identity could have improperly influenced the outcome of the proceedings.

For the foregoing reasons, we conclude that the defendant has failed to demonstrate that a constitutional violation exists that deprived him of a fair trial. Accordingly, his claim fails under *Golding*'s third prong.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also claims that the court abused its discretion in denying his motion for stay of execution of his probation and his motion for stay of the conditions of probation. At oral argument before this court, defense counsel withdrew this claim. We note that this challenge is not reviewable on appeal. See, e.g., Practice Book § 61-14; *Clark* v. *Clark*, 150 Conn. App. 551, 575–76, 91 A.3d 944 (2014) (declining to review claim that trial court improperly lifted appellate stay because it was improperly presented for resolution on appeal, rather than by motion for review).

[2] The defendant also contends that the court's first and second articulations are inconsistent with each other because, at the June 17, 2019 hearing on the defendant's postverdict motions, which was incorporated by reference into the court's first articulation, the court determined that there was no documentation confirming the defendant's income or employment but the court in its second articulation had clarified that the defendant had an earning capacity that would enable him to make the restitution payments. Even if we were to assume that the court's statements at the June 17, 2019 postsentencing hearing—that the defendant had not provided the court with documentation of income or employment—were somehow relevant to the defendant's ability to pay restitution at the time of sentencing, those statements are not inconsistent with the court's statement in its second articulation that the defendant has an *earning capacity*, which relates to an ability to earn money in the future. Accordingly, because the actions that form the basis for the claim of error did not occur, there can be no manifest injustice warranting reversal of the judgment pursuant to the plain error doctrine. See, e.g., *State* v. *Moore*, 85 Conn. App. 7, 11, 855 A.2d 1006 (claim under plain error doctrine does not warrant review when trial court's action does not result in any manifest injustice), cert. denied, 271 Conn. 937, 861 A.2d 510 (2004).

[3] We do not consider the court's January 8, 2020 articulation, which referenced the June 17, 2019 hearing on postverdict motions at which the defendant testified, in this analysis. We instead confine our review to the evidence before the court at the time of sentencing.

[4] The defendant was represented by counsel at this hearing.

[5] At the conclusion of the third day of trial, during which the defendant testified, the court concluded that the defendant had forfeited the right to continue to represent himself. The following day, however, the court vacated its ruling and permitted the defendant to continue to represent himself with standby counsel.

[6] It appears from the record that Judge Doyle charged the jury because Judge Crawford was unavailable. Neither party raises this as an issue on

appeal.

[7] The record does not reflect whether the court's questioning in this instance played a role in the defendant's decision to testify. Nevertheless, as we discuss, the record reflects that the defendant's identity was not in dispute at this point.

_____